COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-017-CR
  
  
DEBORAH 
LYNN PIERINGER                                                    APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Deborah Lynn Pieringer appeals her capital murder conviction, arguing that 1) 
her trial counsel rendered ineffective assistance of counsel and 2) the evidence 
is factually and legally insufficient to support her conviction.
Factual and 
Procedural Background
        Loyd 
Courtney worked for the Fort Worth Police Department for approximately fifty 
years. He first served as a member of the police department and later became a 
fingerprint expert. On November 2, 2001, neighbors noticed that Mr. Courtney did 
not leave for his afternoon shift at the police department. At approximately 
5:30 p.m., Officer Mike Galusha was called out to the Courtneys’ home to 
perform a welfare check. After obtaining entry into the home with a neighbor’s 
key, Galusha discovered the bodies of Mr. Courtney and his wife Agnes, which had 
been beaten with four cast-iron skillets, stabbed, and cut with a knife. Mr. 
Courtney was found on the kitchen floor near the dining room table with a typed 
note resting on his thigh. The note, implying that the murders were revenge for 
Mr. Courtney’s role in sending a defendant to prison in his capacity as a 
fingerprint analyst with the Fort Worth Police Department, had a paring knife 
inserted through it. Mrs. Courtney was found in a back bedroom lying face down 
in a pool of blood. The medical examiner testified that Mr. Courtney suffered at 
least seven cut wounds, twelve stab wounds, and seventeen blunt force trauma 
injuries on his body. Likewise, Mrs. Courtney had seven cut wounds, fifteen stab 
wounds, and seventeen blunt force trauma injuries.
        The 
police found the pieces of four cast-iron skillets, which were shattered in the 
attacks, as well as a broken end table. There were no signs of forced entry into 
the home and all the doors were locked. In the kitchen, the wire to the 
telephone had been cut, and in one of the bedrooms, the wire to the caller 
identification box had been cut and the computer dumped on the floor. An 
analysis of the computer showed that Microsoft Word was accessed at 9:57 a.m., 
that it was the only program used on the computer that day, and that a document 
was sent to the printer at 10:01 a.m. The computer was shutdown at 11:19 a.m.
        The 
police found grocery bags, with the groceries still inside, sitting on the 
kitchen floor and the contents of Mrs. Courtney’s purse spread out on a 
credenza in the kitchen. The Courtneys’ trash was dumped out onto the floor in 
the utility room and the liner from the trash can was missing. Back in one of 
the bedrooms where Mr. Courtney apparently kept his things, the room was 
undisturbed except for one dresser drawer that was pulled out and dumped onto 
the floor. Although the police found several wallets in that room, they did not 
recover a wallet with a driver’s license or insurance card that would indicate 
the wallet was being used by Mr. Courtney at the time of his murder. No blood 
was found in any of the sinks or bathtubs in the house. Crime scene search unit 
officer Patrick Gass also testified that all of the sinks and bathtubs were dry, 
leading him to conclude that if the killer washed up after the murders, it was 
not in the bathrooms or the kitchen sink.
        Appellant 
is the Courtneys’ daughter. According to Appellant, she arrived at her 
parents’ home around 8:15 or 8:30 on the morning of the murders to collect a 
receipt for some trees purchased by Mrs. Courtney as a gift for Appellant’s 
husband, Paul Pieringer. When she arrived, Mr. Courtney was playing on the 
computer and Mrs. Courtney was away from home running errands. Mrs. Courtney 
returned home around 9:30 a.m. and Appellant left about an hour later.
        Dr. 
Maria Abalos, a veterinarian living behind the Courtneys, worked overnight 
shifts and typically slept during the day. On November 2, 2001, Dr. Abalos went 
to sleep around 10:00 a.m. only to be awakened sometime before 1:00 p.m. by her 
two dogs’ constant barking. Despite being well-trained dogs, they would not 
come to Dr. Abalos when she called them. After several attempts to call the 
dogs, Dr. Abalos walked to the edge of her backyard to retrieve one of the dogs. 
When she reached the dog, she noticed that it was barking at a man in the 
Courtneys’ backyard wearing blue coveralls. After the Courtneys’ bodies were 
discovered, Dr. Abalos assisted police in drawing a composite of the man she saw 
in the backyard.
        Appellant 
was arrested after DNA tests revealed that her blood was found in six different 
places inside the Courtneys’ house. Police officers testified that in their 
discussions with Appellant, and later at the Courtneys’ funeral, they noticed 
cuts on her hand and bruises on her arms consistent with someone grabbing 
Appellant’s arms. Appellant explained the bruises by claiming that she fell 
down the stairs as she was leaving her home to pick up her daughter from school 
on the day of the murders. Appellant testified that the blood came from a cut on 
her hand received while doing dishes at her home and reopened while doing dishes 
at the Courtneys’ house. The State did not produce any evidence that it found 
blood in Appellant’s vehicle, on her clothes, or in any other location that 
would further connect her to the crime.
        The 
State produced a handwritten itinerary found in Appellant’s home that outlined 
her activities on the day of the murders. Appellant wrote in the itinerary that 
she arrived at her parent’s home around 10:00 a.m. and left shortly 
thereafter, contradicting her testimony that she arrived at the Courtneys’ 
house between 8:15 and 8:30 a.m. In the itinerary, Appellant stated that she cut 
her finger on a knife while washing dishes and then later ripped the cut open 
while picking up rocks in her yard. The police also searched Appellant’s car 
and found a book in the trunk entitled, “How to Live and Die with Texas 
Probate.”
        Appellant 
and her husband admitted that they relied on the Courtneys for financial support 
for many years. The State, contending that Appellant was motivated by money, 
offered evidence that Appellant was a beneficiary of the Courtneys’ estate and 
stood to inherit approximately $225,000. After a four-day trial, a jury found 
Appellant guilty of capital murder and the trial court sentenced her to life in 
prison.
Ineffective 
Assistance of Counsel
        In 
Appellant’s first issue, she argues that her trial counsel was ineffective in 
1) failing to discuss any area of law applicable to the case or probation 
eligibility during voir dire, 2) failing to ask questions during voir dire that 
were designed to enable an intelligent exercise of peremptory strikes or 
challenges for cause, 3) failing to properly investigate defenses, obtain expert 
witnesses, and examine the State’s evidence, 4) failing to request the lesser 
included offense of murder in the jury charge, and 5) failing to object to 
numerous objectionable and inadmissible items throughout the trial.
        We 
apply a two-pronged test to ineffective assistance of counsel claims.  Strickland 
v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Thompson 
v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). First, Appellant must 
show that her counsel's performance was deficient; second, Appellant must show 
the deficient performance prejudiced the defense. Strickland, 466 U.S. at 
687, 104 S. Ct. at 2064.
        In 
evaluating the effectiveness of counsel under the first prong, we look to the 
totality of the representation and the particular circumstances of each case. Thompson, 
9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under 
all the circumstances and prevailing professional norms at the time of the 
alleged error. Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065. 
“[C]ounsel is strongly presumed to have rendered adequate assistance and made 
all significant decisions in the exercise of reasonable professional 
judgment.” Id. at 690, 104 S. Ct. at 2066.  An allegation of 
ineffective assistance must be firmly founded in the record, and the record must 
affirmatively demonstrate the alleged ineffectiveness.  Thompson, 9 
S.W.3d at 814.  Our scrutiny of counsel's performance must be highly 
deferential, and every effort must be made to eliminate the distorting effects 
of hindsight. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.
        The 
second prong of Strickland requires a showing that counsel's errors were 
so serious that they deprived the defendant of a fair trial, i.e., a trial whose 
result is reliable. Id. at 687, 104 S. Ct. at 2064. In other words, 
appellant must show there is a reasonable probability that, but for counsel's 
unprofessional errors, the result of the proceeding would have been different. Id. 
at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient 
to undermine confidence in the outcome. Id. The ultimate focus of our 
inquiry must be on the fundamental fairness of the proceeding whose result is 
being challenged. Id. at 697, 104 S. Ct. at 2070.
        The 
defendant bears the burden to prove ineffective assistance of counsel by a 
preponderance of the evidence. Thompson, 9 S.W.3d at 813. A defendant 
must overcome the presumption that, under the circumstances, the challenged 
action might be considered sound trial strategy. Gamble v. State, 916 
S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). The defendant's 
burden is even more difficult when, as in this case, the defendant does not file 
a motion for new trial asserting ineffective assistance of counsel. See 
Jackson v. State, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); Gibbs v. 
State, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). 
Assertions of ineffective assistance of counsel must be firmly founded in the 
record. Bone v. State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Trial 
counsel should ordinarily be afforded an opportunity to explain his actions 
before being denounced as ineffective and an appellate court will not find 
ineffectiveness based on speculation. Id. at 836; Henderson v. State, 
29 S.W.3d 616, 624 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). However, 
“in the rare case where the record on direct appeal is sufficient to prove 
that counsel's performance was deficient, an appellate court should obviously 
address the claim.” Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. 
Crim. App. 2000).
        Appellant 
first contends that her trial counsel’s voir dire fell well below an objective 
standard of reasonableness under prevailing professional norms. Appellant argues 
that her counsel failed to ask questions regarding any area of law applicable to 
the case and instead focused on what bumper stickers each individual juror had 
on his or her car. Further, trial counsel did not address probation or ask 
questions designed to determine whether the views of prospective jurors would 
justify a challenge for cause or peremptory strike.
        The 
purpose of voir dire questioning is to determine whether a potential juror 
should be challenged for cause or peremptorily, or whether he or she should be 
accepted by the examining party for service on the jury. Goodspeed v. State, 
120 S.W.3d 408, 411 (Tex. App.—Texarkana 2003, pet. granted) (citing Eason 
v. State, 563 S.W.2d 945, 946-47 (Tex. Crim. App. [Panel Op.] 1978)). A 
thorough review of the voir dire record indicates that Appellant’s counsel 
asked several questions that could have been motivated by trial counsel’s 
desire to elicit information that would be helpful in identifying possible 
challenges for cause or peremptory strikes. Appellant’s trial counsel 
questioned jurors regarding their misdemeanor records, past trial experiences as 
jurors and litigants, and special knowledge regarding forensics. Although we do 
not have the benefit of testimony regarding counsel’s trial strategy, the voir 
dire record reflects a hint of trial counsel’s rationale behind the bumper 
sticker questions. During voir dire, Appellant’s counsel explained to the jury 
that he would ask each one of them what bumper stickers they had on their cars 
because “normally these things say something about you.” As an example, he 
noted, “[i]f you have, let’s say, a Deputy Sheriff’s Association sticker 
on your car, that would be something nice to know.”
        Appellant 
complains that her trial counsel did not determine which jurors were unable to 
consider the full range of punishment, claiming that upon a conviction of a 
lesser included offense of murder, Appellant would have been eligible for 
community supervision.  See Tex. 
Code Crim. Proc. Ann. art. 42.12 § 4(e) (Vernon Supp. 2004).  
Responding, the State argues that this was a capital murder case in which 
probation would not be an issue for the jury to decide.  See Tex. Penal Code Ann. § 12.31(a) (Vernon 
2003), § 19.03 (Vernon Supp. 2004).  Although unclear, the State appears 
to argue that because trial counsel stated in his opening statement that the 
only real issue was whether Appellant cut her finger while she was committing 
this crime or earlier in the day, counsel was conceding that the Courtneys were 
murdered during the same criminal transaction, thus meeting the requirements for 
capital murder.  In the present case, the record provides no explanation or 
inquiry into possible tactical reasons for counsel’s failure to address 
probation eligibility and areas of the law applicable to the case and thus fails 
to rebut the strong presumption of reasonable counsel during Appellant’s voir 
dire.  See Thompson, 9 S.W.3d at 813.
        Appellant 
also claims that trial counsel was ineffective in failing to properly 
investigate defenses, obtain expert witnesses, and examine the State’s 
evidence.  According to Appellant, trial counsel made no effort to impeach 
or investigate the State’s evidence that Appellant’s blood was found in six 
different places. Further, Appellant asserts that there can be no trial strategy 
in failing to at least request an expert to review or examine the State’s 
laboratory results concerning the DNA findings or question the expert outside 
the jury’s presence regarding the expert’s qualifications, potential rate of 
error in the technique, or reliability of the testing. Instead, trial counsel 
simply conceded that Appellant’s blood was found in six places within the 
Courtneys’ home.  Likewise, Appellant argues that her trial counsel 
should have independently tested hairs found in Mrs. Courtney’s hand, 
fingerprints found at the scene, and the State’s computer analysis.  
Appellant also complains that her trial counsel failed to object to numerous 
objectionable and inadmissible items throughout the trial, and should have 
requested the lesser included offense of murder in the jury charge.
        The 
record before us is silent as to why Appellant's trial counsel did not request 
the appointment of an expert witness or rebut the State’s blood 
evidence.  The record is also silent as to why Appellant's trial counsel 
did not object to various objectionable and inadmissible items throughout the 
trial.  Appellant has failed, therefore, to rebut the presumption that 
these actions were part of her trial counsel's sound trial strategy.  To 
find that trial counsel was ineffective based on the asserted grounds would call 
for speculation, which we will not do.  See Jackson v. State, 
877 S.W.2d 768, 771 (Tex. Crim. App. 1994); Gamble, 916 S.W.2d at 
93.  Only on further inquiry can an adequate determination be made as to 
whether counsel provided Appellant with effective assistance.  A thorough 
review of the record before us indicates that this is not one of those “rare 
cases” in which we can assess counsel's performance on a silent record.  See 
Robinson, 16 S.W.3d at 813 n.7.  In this instance, an application for 
writ of habeas corpus is the more appropriate vehicle for Appellant’s 
claim.  See id. at 814 (Mansfield, J. dissenting).  An 
application for writ of habeas corpus relief would “provide an opportunity to 
conduct a dedicated hearing to consider the facts, circumstances, and rationale 
behind counsel’s actions at . . . trial.”  Thompson, 9 S.W.3d at 
814-15.  We overrule Appellant’s first issue.
Factual and 
Legal Sufficiency
        In 
Appellant’s second issue, she contends that the evidence is factually and 
legally insufficient to support her conviction.  The court of criminal 
appeals has recently restated and clarified the standard of review to be used by 
appellate courts in reviewing the factual sufficiency of the evidence to support 
a conviction.  In Zuniga v. State, the court held: 
 
There 
is only one question to be answered in a factual sufficiency review: Considering 
all of the evidence in a neutral light, was a jury rationally justified in 
finding guilt beyond a reasonable doubt? However, there are two ways in which 
the evidence may be insufficient. First, when considered by itself, evidence 
supporting the verdict may be too weak to support the finding of guilt beyond a 
reasonable doubt. Second, there may be both evidence supporting the verdict and 
evidence contrary to the verdict. Weighing all the evidence under this balancing 
scale, the contrary evidence may be strong enough that the 
beyond-a-reasonable-doubt standard could not have been met, so the guilty 
verdict should not stand. This standard acknowledges that evidence of guilt can 
“preponderate” in favor of conviction but still be insufficient to prove the 
elements of the crime beyond a reasonable doubt. Stated another way, evidence 
supporting guilt can “outweigh” the contrary proof and still be factually 
insufficient under a beyond-a- reasonable-doubt standard.

 
No. 
539-02, 2004 WL 840786, at *7 (Tex. Crim. App. Apr. 21, 2004).
        To 
make a determination of factual insufficiency, a complete and detailed 
examination of all the relevant evidence is required. Johnson v. State, 
23 S.W.3d 1, 12 (Tex. Crim. App. 2003). A proper factual sufficiency review must 
include a discussion of the most important and relevant evidence that supports 
the appellant’s complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 
(Tex. Crim. App. 2003). A factual sufficiency review of circumstantial evidence 
is the same as a review of direct evidence. King v. State, 29 S.W.3d 556, 
565 (Tex. Crim. App. 2000); Kutzner v. State, 994 S.W.2d 180, 184 (Tex. 
Crim. App. 1999).
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Burden v. State, 55 S.W.3d 
608, 612 (Tex. Crim. App. 2001). This standard gives full play to the 
responsibility of the trier of fact to resolve conflicts in the testimony, to 
weigh the evidence, and to draw reasonable inferences from basic facts to 
ultimate facts. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. When 
performing a legal sufficiency review, we may not sit as a thirteenth juror, 
re-evaluating the weight and credibility of the evidence and, thus, substituting 
our judgment for that of the fact finder. Dewberry v. State, 4 S.W.3d 
735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000). The 
standard of review is the same for direct and circumstantial evidence cases. Burden, 
55 S.W.3d at 613; Kutzner, 994 S.W.2d at 184.
        Appellant, 
in support of her assertion that the evidence is insufficient to support her 
conviction, points to many instances wherein the evidence used by the State to 
support her guilt could be viewed as wholly innocent conduct. Appellant first 
contends that the evidence established a valid reason for her appearance at the 
Courtneys’ home on the day of the murders. Both Appellant and her husband 
testified that Mrs. Courtney gave Mr. Pieringer two trees for his birthday, 
which were to be delivered and planted at the Pieringers’ home on November 2, 
2001. According to Appellant, she went to the Courtneys’ home to pick up the 
receipt for the trees and some concert tickets to see Mrs. Courtney’s upcoming 
performance in the Sweet Adelines Barbershop Chorus for Women. Appellant gave 
the receipt to her trial counsel, and a copy of the receipt was admitted into 
evidence. In response, the State argues that the evidence did not prove that 
Appellant picked up the receipt on the day of the murders—only that Appellant 
picked up the receipt some time before the murders occurred. The State also 
points out that possession of the receipt does nothing to establish that 
Appellant was not guilty because she could have picked up the receipt and then 
murdered her parents before she left the house.
        Appellant 
next contends that she provided a reasonable explanation for the minimal amount 
of her blood found at the Courtneys’ house. Appellant testified that she cut 
her finger earlier in the day while washing dishes and then reopened the cut 
while washing dishes at the Courtneys’ home the day of the murders. Fort Worth 
police officer Tom Boetcher testified that when he went to inform Appellant that 
her parents had been murdered, he noticed two cuts on her left index 
finger—one on the palm side and one on the outer side. Appellant stresses that 
her blood was not found mixed with the victim’s blood anywhere in the house 
and that the State did not produce any evidence to show that her blood was left 
at the scene at the time of the murders as opposed to before the murders 
occurred.
        The 
State, in turn, disagrees with Appellant’s characterization of the blood found 
at the scene of the crime as “minimal,” describing some of the six locations 
where Appellant’s blood was found as a large amount. Appellant’s blood was 
found on the dining room table, within a foot of Mr. Courtney’s body, on a 
kitchen drawer where knives were kept, on the exterior surface of the bedroom 
door where Mrs. Courtney’s body was found, on a mirror attached to the 
exterior side of the same bedroom door, on the caller identification box for 
which the wires had been cut, and on the lid of the trash can that was dumped 
out on the floor. Jim Varnon, a detective for the Fort Worth Police Department, 
described the amount of Appellant’s blood on the mirror as “a significant 
amount of blood. It’s quite visible, hard to miss.”  He additionally 
testified that the blood found on the kitchen drawer was taken from a “visible 
bloodstain.”  Detective Matthew Hardy agreed that the amount of blood on 
the mirror was “a lot” of blood, not a “little.”
        Appellant 
argues that if she had obtained the knife from the kitchen drawer in order to 
commit the murders as the State contends, there would not have been any blood on 
her at the time she retrieved the knife from the drawer.  Rather, Appellant 
argues that the more logical explanation for her blood being on the drawer is 
that she opened up the drawer after reopening the cuts on her fingers while 
doing dishes at the Courtneys’ house.  Under the State’s theory, 
however, Appellant attacked Mr. Courtney first with a skillet or the broken end 
table found in the living room, disabling him to some extent, before grabbing 
the paring knife from the kitchen drawer to finish the attack. The Tarrant 
County Medical Examiner, Dr. Nizam Peerwani, testified that Mr. Courtney’s 
blunt force trauma injuries were likely defensive wounds, while the cut wounds 
on his neck were “coup de grace” wounds. Dr. Peerwani defined “coup de 
grace” wounds as being produced when the victim is no longer able to defend 
himself for the purpose of ensuring that the victim is dead. Appellant 
additionally claims that if she was the murderer, she would have known to clean 
up inculpatory evidence such as her blood located in what she describes as 
“obvious” locations. The State contends, however, that due to the large 
amount of blood found at the scene, it would have been impossible for her to 
distinguish her blood from the victims’ blood.
        According 
to Appellant, evidence offered at trial points to her innocence rather than her 
guilt in several additional instances. First, Appellant refutes the sufficiency 
of the State’s evidence that the note left on Mr. Courtney’s leg was written 
and printed at the scene. Troy Lawrence, a Fort Worth police officer and 
computer forensic analyst, testified that Microsoft Word was accessed at 9:57 
a.m. on the day of the murders, that an unsaved document was created and sent to 
the printer at 10:01 a.m., and that the computer was shut off at 11:19 a.m. 
Notably, Appellant testified that Mr. Courtney was playing on the computer when 
she arrived at the house around 8:15 or 8:30 that morning.
        Second, 
Appellant argues that the evidence does not support the State’s theory that 
Appellant’s motive for murder was financial gain because the evidence clearly 
showed that the Courtneys provided her with financial support for many years. 
Furthermore, Appellant points out that possession of a book on probate law 
purchased after the murders is more indicative of innocent behavior 
exhibited by a co-executor of her parents’ estate than it is of an individual 
trying to conceal murder.
        Third, 
Appellant points out that, given the violence of the murders, it is unlikely 
that the killer would escape with only two cuts on her finger. In fact, Dr. 
Peerwani testified that it would be highly unlikely for someone to deliver 
seventy-five blows without being covered with the blood of the victims.
        Fourth, 
evidence that there was no forced entry and that the doors were all locked when 
the Courtneys were found does not exclude the possibility that a stranger 
committed the murders. There is no evidence on the record that Appellant had a 
key to her parents’ home and there was testimony that no garage door openers 
were found at the scene. Moreover, there was no evidence that the Courtneys’ 
door was not the type of door that automatically locks when the door is shut.
        Fifth, 
Appellant strongly emphasizes the fact that no blood was found in her car or on 
any of her clothing despite the fact that she undisputedly drove her car home 
from the Courtneys’ house on the day of the murders. Appellant urges that the 
lack of blood in any of the drains, coupled with testimony that none of the 
drains were wet, indicates that there was not an attempt to clean up the scene, 
making it a “virtual impossibility” that she committed these violent murders 
and then drove her car without leaving a trace of blood. The State argues that 
there was a clean up, as evidenced by the missing trash can liner and handles 
for three of the iron skillets used in the murders. The State’s theory is that 
the killer cleaned up in some fashion and then used the trash can liner to carry 
away evidence.
        Finally, 
Appellant argues that the State’s evidence regarding the computer establishes 
that Appellant was gone from the house when the computer was turned off. The 
Courtneys’ neighbor, Mabel Szabo, testified that she saw Appellant near her 
car between 10:15 and 10:25 that morning and according to the State’s computer 
forensic analyst, the computer was not shut off until 11:19 a.m.  Ms. Szabo 
did not, however, testify that she saw Appellant leave—only that she saw 
Appellant near her car around 10:15 a.m. and that when she returned to her house 
just before noon, Appellant’s car was gone.
        While 
many of Appellant’s arguments successfully point out that the State’s 
evidence could also be interpreted in a manner consistent with Appellant’s 
innocence, the evidence is such that a rational jury could have found beyond a 
reasonable doubt that Appellant was guilty.  Moreover, after examining the 
evidence in a neutral light, we find that the supporting evidence is not so 
weak, nor is the contrary evidence so overwhelmingly strong, as to render the 
verdict clearly wrong and manifestly unjust.  The jury was free to believe 
the State’s theory, especially in light of Appellant’s behavior that would 
logically lessen her credibility in the eyes of the jurors.  Appellant’s 
accounts of that day were inconsistent.  She initially told police that she 
arrived at the Courtneys’ home around 10:00 a.m. and stayed for just a few 
minutes.  Her written itinerary, written a few days after the murders, also 
indicates that she arrived around 10:00 a.m.  Later, Appellant told police 
that she went to her parents’ house around 8:15 or 8:30 a.m. and stayed until 
9:45 a.m.  Then at trial, Appellant testified that she arrived at the home 
between 8:15 and 8:30 a.m. and stayed until 10:30 or 10:45 a.m.  The jury, 
as trier of fact, is entitled to resolve any conflicts in the evidence, to 
evaluate the credibility of witnesses, and to determine the weight to be given 
any particular evidence.  See Jones v. State, 944 S.W.2d 642, 647 
(Tex. Crim. App. 1996), cert. denied, 522 U.S. 832 (1997).  We 
overrule Appellant’s second issue.
Conclusion
        Having 
overruled both of Appellant’s issues, we affirm the trial court’s judgment.
  
  
                                                                  DIXON 
W. HOLMAN
                                                                  JUSTICE
 
  
PANEL B:   HOLMAN, 
GARDNER, and WALKER, JJ.
 
PUBLISH
 
DELIVERED: 
June 17, 2004